Walter BELL, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 68989.

Court of Criminal Appeals of Texas, En Banc.

March 19, 1986.

Rehearing Denied July 9, 1986.

Douglas M. Barlow, Beaumont, for appellant.

James S. McGrath, Dist. Atty. & John R. DeWitt, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty., Austin, for the State.

Before the Court en banc.

## OPINION

MILLER, Judge.

This is an appeal taken from a conviction of capital murder.[1] See V.T.C.A. Penal Code, § 19.03(a)(2). The death penalty was imposed after the jury answered affirmatively the special issues submitted under Art. 37.071(b), V.A.C.C.P. Appellant brings fifteen grounds of error before this court. We will affirm.

In his sixth ground of error appellant challenges the legality of his warrantless arrest, and the admissibility of the fruits of

---

**1.** Appellant was previously convicted for the related capital murder of Irene Chisum. *Bell v. State,* 582 S.W.2d 800 (Tex.Cr.App.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3145, 69 L.Ed.2d 995 (1981), *reh. denied,* 453 U.S. 927, 102 S.Ct. 889, 69 L.Ed.2d 1022 (1981). The instant case is a conviction for the capital murder of her husband, Ferd Chisum, as part of the same transaction.

that arrest. Grounds of error seven and eight challenge the admission into evidence of appellant's first and second confessions, respectively, on the grounds that they were not shown to be made voluntarily. Appellant's motion to suppress his two confessions and items taken from his home was overruled by the trial court. A rendition of the facts surrounding the arrest and the confessions is necessary to evaluate appellant's claims. The three grounds of error are addressed in this discussion because they are interrelated.

On Friday morning, July 19, 1974, the bodies of Ferd and Irene Chisum were found in the bathtub of their home in Port Arthur. They were owners and operators of a business known as the Appliance Service Center. The bodies were discovered after the Chisums failed to report to their business and an employee went to investigate. Virtually the entire following sequence of events, concerning what occurred over the weekend following discovery of the bodies, was described at trial by Calise Blanchard, an investigator with the Jefferson County District Attorney's Office.

In the early afternoon of July 19, Blanchard was told that appellant was one of three recently fired employees and that there was some animosity between appellant and Ferd Chisum over the firing. Blanchard and investigator Pat Hayes of the District Attorney's Office were unable to find appellant at his last known address, and before proceeding to the address of another former employee, they were dispatched by radio to the Sabine National Bank.

Arriving there at about 4:00 p.m., they learned the details of an attempt to cash a check on the Chisum's account and received a description of the individual who made the attempt. The individual, who had a companion, was a black male in his early twenties, used the name "Bobbie Williams," and wore a green football jersey bearing the number "12." The check initially aroused suspicion of forgery because it was filled out with the numbered amount "600" and the written amount "six" dol-

lars, and the signature on the check did not match the file signature. The information concerning the attempted check cashing was broadcasted over the police radio.

Blanchard and Hayes traced the taxi used by the forgery suspect to the "Soul Kitchen," where they asked if anyone had seen the person described by the bank employees. The information on the police radio broadcast was not publicly known, so the people at the Soul Kitchen would not have known why the police were looking for the individual seen at the bank. No one at the restaurant acknowledged having seen the suspect.

At this time, the police did not know if appellant, whom they had been looking for earlier, and "Bobbie Williams" were the same person. At approximately 12:30 a.m. on the 20th, however, a man named Donald Brown appeared at the police station with a photograph of three men. He identified the person in the green jersey being sought by the police as Walter Bell, whom he personally knew. The police now knew that one of the recently fired suspects and the man in the jersey were the same person, namely appellant.

Brown told Blanchard and the police that they just missed appellant when they went to the Soul Kitchen, and that Brown had seen appellant nearby. Brown told Blanchard that he had warned appellant that the police were looking for him. Brown also told Blanchard that he had just left appellant at the Satellite Bar, and that he could still be found there. Blanchard now believed that he had probable cause to arrest appellant, and thought that he did not need a warrant because he knew that the bars closed at 1:00 a.m., when appellant's whereabouts would again be unknown. He immediately dispatched officers to the Satellite Bar, and appellant was subsequently arrested on Houston Avenue outside of the bar.

Blanchard gave appellant the warnings required under Art. 38.22, V.A.C.C.P., and informed him that he was under suspicion for forgery and the murder of the Chisums. Appellant denied any involvement, but gave Blanchard written permission to

search his residence. Officers were dispatched there, and recovered the jersey, the male and female ends of an extension cord similar to a portion of a cord previously found on the floor of the Chisums' bathroom, and a plastic container of coins taken from the Chisums' home.

At approximately 3:00 a.m. Blanchard confronted appellant with the results of the search and appellant orally confessed to the murders. Between 3:55 and 4:45 a.m. Blanchard took a written confession from appellant, and again advised appellant of his rights; appellant signed the confession immediately thereafter. Appellant was then examined by a physician, who found no physical abuse or damage.

Blanchard and Hayes prepared complaints and warrants charging appellant with capital murder. Appellant was presented to a Justice of the Peace, received a Magistrate's warning, and the complaints and warrants were signed. After processing of appellant for fingerprints and photographs, Blanchard took appellant to breakfast and returned after sunrise. He went out with appellant on an unsuccessful attempt to find a knife which appellant mentioned in his confession, then appellant was returned to jail.

For the remainder of the day, Saturday, July 20, the investigation continued while appellant remained in custody. The record does not reflect any contact between appellant and the investigating officers. On Sunday morning, appellant was allowed to visit with his mother and step-father. Blanchard was awakened around noon on that Sunday by a call from the police station which indicated that appellant wished to talk to him again. Blanchard ate lunch, then went down to the jail, and appellant told him, "you are going to be mad at me because I didn't tell you the truth." Appellant was taken from the jail to the District Attorney's office where he was again issued warnings. Appellant then gave a second written confession in which he admitted robbing the Chisums and raping Mrs. Chisum. Additionally, he implicated Shepperd Watson in the crime.

After the second written confession was taken a search of appellant's residence was executed with appellant's assistance, and several incriminating items of evidence were discovered. Earlier in the afternoon another search of appellant's residence had disclosed other incriminating items. All searches of appellant's residence were conducted with his consent.

On Monday the 22nd, appellant agreed to go to the Chisum house and point out the location of some checks that police officers were searching for. Appellant pointed to a book in the study which contained the checks. Blanchard testified that appellant then made a complete oral confession and reenacted the crime. Appellant's left thumbprint was lifted from a can of Hi-C juice in the Chisum kitchen.

In his sixth ground of error appellant argues that his arrest was illegal and that all evidence and confessions that were fruit of the illegal arrest should have been excluded at trial. He contends that no exigent circumstances existed to relieve the State of its statutory duty to obtain a warrant before arresting him, citing *Honeycutt v. State,* 499 S.W.2d 662 (Tex.Cr.App. 1973). He correctly asserts that the burden is on the State to show that the arrest was within an exception to the warrant requirement. See *id.,* and *Wilson v. State,* 621 S.W.2d 799 (Tex.Cr.App.1981).

The police did have probable cause to arrest appellant for murder after he was identified in the photograph by Donald Brown. They knew then that appellant knew the Chisums, that he had a motive to do them wrong because of his recent firing, that there was some animosity between appellant and the Chisums, and that appellant was the man who attempted to dispose of some of the fruits of the crime shortly after the murder. The exigent circumstances test of Art. 14.04 V.A.C.C.P., however, was not satisfied.

Art. 14.04, supra, states:
"Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, *and that the of-*

5

*fender is about to escape, so that there is no time to procure a warrant,* such peace officer may, without warrant, pursue and arrest the accused." (Emphasis added.)

Although Blanchard testified that he could not have obtained a warrant before the bar closed and did not know where to find appellant after the bar closed, there is no evidence that appellant was about to escape or that the officers thought he was about to escape. Brown told the police that he had warned appellant earlier in the day that the police were looking for him, but appellant was still in the vicinity at a local bar at midnight. "It is the information that an escape is imminent which dispenses with the necessity of a warrant of arrest." *Bain v. State,* 677 S.W.2d 51, 56 (Tex.Cr.App.1984), quoting *Rutherford v. State,* 104 Tex.Cr.R. 127, 283 S.W. 512, 514–515 (Tex.Cr.App.1926). Because of the absence of the required exigent circumstances, we hold that the arrest was improper.

Having so concluded, we must exclude all evidence obtained "in violation of any provisions of the Constitution or laws of the State of Texas," under Art. 38.23, V.A.C.C.P., and all evidence that is obtained "as a direct result of" the illegal detention under the exclusionary rule of the Fourth Amendment. *Wong Sun v. United States,* 371 U.S. 471 at 485, 83 S.Ct. 407 at 416, 9 L.Ed.2d 441 at 454 (1963).

It is important to note that evidence is not excluded simply because it is discovered or obtained at a point in time after an illegal detention. In order to determine exactly which evidence falls within the contemplated parameters of Art. 38.23, V.A.C.C.P., and *Wong Sun,* supra, we turn to the four-prong analysis of *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) and apply it to the facts in this case.

To determine whether appellant's confessions were the fruit of his illegal arrest we are not *bound* to follow the analysis of *Brown* and progeny since no federal constitutional violations are here involved. See *Duncan v. State,* 639 S.W.2d 314, 318 (Tex. Cr.App.1982). Nevertheless, the statutory violation at issue here is in no sense technical or unimportant. As we stated in *Rutherford,* supra at 283 S.W. 514, discussing Art. 14.04, supra:

"The purpose of the statute is to give effect to the guaranty of the Bill of Rights against the unreasonable seizure of the person, and to safeguard the public in the apprehension of offenders whose escape would be effected if a warrant was imperative."

The Legislature has determined through its enactment of Arts. 14.01 through 14.04 and 38.23, V.A.C.C.P., that the right to be free from warrantless arrest is at least equal in magnitude to the state and federal constitutional right to be free from unreasonable searches and seizures. The four part test established in *Brown,* supra, and progeny assures, inter alia, that the State cannot violate the Fourth Amendment with impunity by washing its hands in the procedural waters of the Fifth Amendment: i.e., the State cannot cure Fourth Amendment violations simply by administering the Fifth Amendment warnings required by *Miranda.*[2] Application of the four part *Brown* test in Texas to violations of Arts. 14.01 through 14.04, V.A.C.C.P., will likewise assure that the State cannot violate *those* important statutes. Accordingly, to determine whether a confession has been tainted by a prior warrantless arrest that is illegal as a matter of state statutory law we will utilize the four part test established in *Brown,* supra. We also note that there is considerable Texas authority using the *Brown* analysis,[3]

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1963).

3. See *Foster v. State,* 677 S.W.2d 507 (Tex.Cr. App.1984); *Wicker v. State,* 667 S.W.2d 137 (Tex.Cr.App.1984), *cert. denied,* 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984); *Gregg v. State,* 667 S.W.2d 125 (Tex.Cr.App.1984); *Townsley v. State,* 652 S.W.2d 791 (Tex.Cr.App.

1983); *Ussery v. State,* 651 S.W.2d 767 (Tex.Cr. App.1983); *Gant v. State,* 649 S.W.2d 30 (Tex.Cr. App.1983), *cert. denied,* 464 U.S. 836, 104 S.Ct. 122, 78 L.Ed.2d 120 (1983); *Beasley v. State,* 674 S.W.2d 762 (Tex.Cr.App.1982); *Coleman v. State,* 643 S.W.2d 947 (Tex.Cr.App.1982); *Autry v. State,* 626 S.W.2d 758 (Tex.Cr.App.1982), *cert. denied,* 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d

and that it appears to be the best available framework for cases involving taint attenuation and determining whether a confession is to be excluded as fruit of an illegal arrest.

In *Brown,* supra, the defendant was illegally arrested and taken to a police station where, after being given the *Miranda* warnings, he made incriminating statements concerning a murder for which he was subsequently convicted. The Supreme Court held that the *Miranda* warnings alone were insufficient to attenuate the taint of an arrest in violation of the Fourth Amendment. The Court carefully differentiated between the *Miranda* warnings, which are a procedural safeguard employed to protect Fifth Amendment rights against the compulsion inherent in custodial surroundings, and the exclusionary rule as utilized to effectuate the interests of the Fourth Amendment. *Brown,* supra, 422 U.S. at 602, 95 S.Ct. at 2260. "Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains...." *Id.,* 422 U.S. at 602–603, 95 S.Ct. at 2261.

Rather than articulate a bright line rule for exclusion of confessions taken after Fourth Amendment violations, which is arguably impossible in this area of law, the Court noted four relevant factors to be considered in determining whether the causal chain between the illegal arrest and the statements is broken so that the statements are the product of a free will under *Wong Sun,* supra. These four factors are:

1) the giving of *Miranda* warnings;
2) the temporal proximity of the arrest and the confession;
3) the presence of intervening circumstances; and
4) the purpose and flagrancy of the official misconduct.

*Brown,* supra at 422 U.S. 604–605, 95 S.Ct. 2261–2262. We will now discuss these factors as they relate to the case before us.

■■■■ The factor of giving *Miranda* warnings requires little more than brief mention, at least with regard to appellant's first confession. The warnings were given (repeatedly), as they almost always are as a matter of routine, but even repeated warnings *alone* are not enough to purge the taint of an otherwise illegal arrest. *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). Without the warnings, a confession could be excluded simply on *Miranda* grounds, although the Supreme Court has recently held that failure to warn does not necessarily require exclusion of subsequent, post-warning voluntary confessions. *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

■■■■ The second element, temporal proximity of the arrest and the confession, is generally not a strong determining factor per se, but in this case it does weigh in appellant's favor, against admission of the first confession. Appellant's first confession was obtained in close temporal proximity (within one and a half to three hours) of his arrest.[4] No remarkable circumstances

147 (1982); *Green v. State,* 615 S.W.2d 700 (Tex. Cr.App.1981), *cert. denied,* 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981); *Alonzo v. State,* 591 S.W.2d 842 (Tex.Cr.App.1979); and *Dowdy v. State,* 534 S.W.2d 336 (Tex.Cr.App. 1976).

**4.** This is roughly equal to the time span in *Brown* and that in *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and shorter than the six-hour time span in *Taylor,* supra. Texas cases resolved in favor of the defendant range from spans of one and a half (*Ussery* and *Duncan,* supra) and two hours (*Green,* supra) to two or three days (*Beasley,* supra), while cases resolved in favor of the State range from three hours (*Dowdy,* supra) and five hours (*Coleman,* supra) to twenty-four hours (*Townsley,* supra), twenty-nine hours (*Gant,* su-

pra), and two days (*Alonzo,* supra). Making such a comparison on the basis of time span alone demonstrates its paucity of meaning as a determinative "factor."

We note that the *Brown* court's assumption that the mere passage of time increases the likelihood of the confession being untainted is not sound. It ignores the possibilities for exploitation inherent in the time lapse factor, and that the illegal custody could become more oppressive as it continues uninterrupted. See 3 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 11.4(b) (1978). "Conversely, even an immediate confession may have been motivated by a prearrest event such as a visit with a minister." *Dunaway,* supra, 442 U.S. at 221, 99 S.Ct. at 2261 (Stevens, J., concurring). Finally, a variation on the temporal proximity factor was recognized in *Rawlings*

which would purge the taint of the illegal arrest appear in the record. With such close temporal proximity and without significant intervening circumstances, an inference of a lack of time for reflection appears warranted.

With regard to the third element, intervening circumstances, in this case very few events intervened between the arrest and appellant's first confession: appellant's consent to search, the finding of evidence, and appellant's confrontation with that evidence. Since these incidents themselves flow from the arrest, they militate strongly against attenuation of the taint. This situation is analogous to that in *Taylor*, supra, where the defendant was arrested without probable cause. He was then fingerprinted, the prints were matched with those at the crime scene, and a warrant was belatedly obtained based on the fingerprint identification. The Supreme Court rejected the State's argument that the arrest warrant was an intervening circumstance, noting that the fingerprints were themselves fruit of an illegal detention. *Id.*, 457 U.S. at 692–693, 102 S.Ct. at 2669.

■ This argument is underscored by this Court's opinion in *Townsley*, supra, which was resolved in favor of the State. There, the suspect was illegally arrested without probable cause and subsequently gave a confession. Evidence which established probable cause was obtained after the suspect was illegally confined, but it was obtained by examining the deceased's body and interviewing neighbors, rather than as a fruit of the illegal arrest. The causal chain was thus broken between the defendant's illegal arrest and the confession he ultimately gave: the break occurred when evidence which was independent of the illegal arrest furnished probable cause to arrest the defendant. As Judge Teague points out, dissenting in *Gant*, supra, "there must not be a causal

connection between the confession and the illegal arrest." *Id.* at 40.[5]

■ We therefore agree with appellant that the intervening circumstances were insufficient, by themselves, to break the causal connection between appellant's illegal arrest and his first confession.

■ The fourth factor, police conduct, is one of the most important factors to be considered. All Fourth Amendment violations are, by constitutional definition, "unreasonable," but practical differences between violations should dictate different outcomes. "[T]he point at which the taint can be said to have dissipated should be related, in the absence of other controlling circumstances, to the nature of that taint." *Brown*, supra, 442 U.S. at 610, 95 S.Ct. at 2264. (Powell, J., concurring in part).

Some gradations of conduct must be delineated for the exclusionary rule to perform its deterrence function in this context. "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right." *Michigan v. Tucker*, 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974), quoted in *Brown*, supra, 442 U.S. at 613, 96 S.Ct. at 2266 (Powell, J., concurring in part). The clearest indications of attenuation should be required where police conduct is the most flagrantly abusive. Such conduct includes: reliance on factors in making an arrest which were so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable; an arrest effectuated as a pretext for collateral objectives; or an arrest which is unnecessarily intrusive on personal privacy. *Brown*, supra, 422 U.S. at 611–612, 94 S.Ct. at 2265 (Powell, J., concurring in part). Other jurisdictions have found unattenuated taint when the arrest was made without any apparent justification, as part of a dragnet

---

*v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). There, a short time lapse of 45 minutes was sufficient to purge the taint where the custodial atmosphere in the house of a third party was so "congenial." *Id.*, 448 U.S. at 108, 100 S.Ct. at 2563.

**5.** Significant intervening circumstances would include appearance before a magistrate, termination of the illegal custody, consultation with counsel, and a volunteered statement not made in response to police interrogation. 3 LaFave, *Searches and Seizures*, § 11.4(b) (1978)

operation or upon a pretext, and where it appeared that the illegal arrest was for the purpose of obtaining a confession and the arrest was exploited for that purpose, as by misleading the arrestee as to the purpose for the arrest, subjecting him to continuous interrogation, or threatening him with a polygraph test. See 3 LaFave, *Search and Seizure,* § 11.4(b) (1978).

*Brown,* supra, itself is a leading example of flagrant police conduct. The arrest was made solely on the basis of an unsubstantiated tip which identified Brown as one of the acquaintances of a murder victim, and Brown was virtually ambushed at gunpoint by three plainclothes officers as he returned home one evening. "The manner in which Brown's arrest was effected gives the appearance of having been calculated to cause surprise, fright, and confusion." *Id.,* 422 U.S. at 606, 95 S.Ct. at 2262.

In Texas, *Green,* supra, is another good example. There the defendant's arrest "was effected in the middle of the night, with officers rousing him from sleep, pointing shotguns in his direction, then leading him out into freezing weather with no coat, outer clothing or shoes." *Id.* at 782–783. Another example is *Duncan v. State,* 639 S.W.2d 314 (Tex.Cr.App.1982), in which the defendant was roused from bed at 3:00 a.m. for interrogation purposes, and was interrogated until 6:00 a.m. when she signed a written confession. *Id.* at 318.[6]

Two other Texas cases are instructive on the issue of police misconduct. In *Ussery,* supra, this court specifically declined "to condemn the police officers' conduct as flagrant [although] the purpose and impropriety of their acts are clear." *Id.* at 771. The defendant there was detained after calling the police to the murder scene and bringing attention to himself by making inconsistent statements. Although the police "may have had reasonable or articulable suspicion that the appellant was connected with the commission of the crime," *id.* at 770, we held that it did not rise to sufficient probable cause to justify custodial detention which amounted to an arrest.

Similarly in *Townsley,* supra, the defendant was arrested on the basis of facts sufficient to raise suspicion that he had committed the murder but which did not constitute probable cause. The "improper and flagrant" action consisted of holding the defendant for investigation of a homicide when the police "knew" they lacked probable cause to arrest him. *Id.* at 797. As discussed above, subsequent evidence developed independent of the improper arrest which amounted to probable cause so that subsequent confessions were admissible, an intervening event having broken the causal chain flowing from appellant's brief illegal detention. *Id.* at 797–798.

In this case Detective Blanchard did believe (correctly, as it turns out) that he had probable cause, but had appellant arrested without a warrant so that he could be apprehended at the lounge where Blanchard knew he could be for only one half hour longer. Although the warrantless arrest was nonetheless illegal, we do not weigh the police conduct here decisively against attenuation of the taint. It falls somewhere in between a technical violation and the flagrant conduct discussed by Justice Powell, concurring in part in *Brown,* supra, and demonstrated in *Green,* supra, and *Duncan,* supra. The presence of probable cause in this case distinguishes it from *Ussery* and *Townsley,* supra, and Blanchard's sense of the need for immediate action to apprehend appellant is understandable.

In summary, the temporal proximity and intervening circumstances factors militate heavily against admission of appellant's first confession. The repeated *Miranda* warnings do not significantly affect this conclusion. Concerning the fourth factor, the police conduct here certainly does not shock the conscience of this Court. An otherwise inadmissible confession such as appellant's first confession, however, should not be made admissible simply because the police conduct was not too reprehensible. To so hold would blatantly subject the protection of fundamental rights to

---

**6.** *Duncan,* supra, does not cite *Brown,* supra, but uses the same four-prong analysis under the authority of *Wong Sun,* supra, and various federal appellate decisions.

the vagaries of the collective (elected) conscience of this Court, which we decline to do. The immediate fruits of appellant's arrest—his first confession, the extension cord ends, and the coin container—were tainted and should not have been admitted into evidence at trial. To this extent appellant's ground of error number six is sustained, subject to further analysis.

We now turn to the admissibility of the appellant's second confession and of evidence obtained subsequent to that confession. Because appellant's first confession is inadmissible under the Fourth Amendment as a "fruit of the poisonous tree," we need not decide whether it was voluntary under the Fifth Amendment. We address both issues as to the second confession, in keeping with the Supreme Court's careful distinction between the two issues in *Brown,* supra and *Elstad,* supra.

Addressing the Fourth Amendment question first, we immediately return to the *Brown* analysis of taint attenuation to determine whether the causal chain between the illegal arrest/first confession and subsequent events was broken. Again, the factors concerning taint attenuation and determining whether a confession is to be excluded as fruit of an illegal arrest are: the giving of *Miranda* warnings; the temporal proximity of the arrest and the confession; the presence of intervening circumstances; and the purpose and flagrancy of the official conduct. *Brown,* supra, 422 U.S. at 604–605, 95 S.Ct. at 2261–2262.

At the time of the second confession, appellant had been warned and re-warned, including a presentation before a Justice of the Peace. He had been in custody for over a day, with time to eat, rest and reflect. No additional police conduct occurred that would aggravate the taint. Further, significant intervening circumstances did occur between the arrest and initial confession late on Friday night and the second confession and the searches that also occurred on Sunday and later. Appellant visited with his mother and step-father that Sunday morning,[7] and then he requested to see Blanchard again before making his second confession. The latter obviously also bears on the question of voluntariness for Fifth Amendment purposes, discussed below.

The most important intervening event, for Fourth Amendment purposes, was the procurement of an arrest warrant. The police had probable cause to arrest appellant all along, and lacked only the warrant to achieve legality. Because the police had probable cause all along, they would have been able to obtain a warrant before arresting appellant. Since the illegality was the lack of a warrant, after the warrant was obtained the causal relationship between the illegal arrest and subsequent evidence was severed. We note that this situation differs critically from *Taylor,* supra, where the defendant was arrested without probable cause and a warrant was subsequently obtained *based solely on fruits of the illegal arrest. Id.,* 457 U.S. at 691–693, 102 S.Ct. at 2667–2668.[8] Here,

---

**7.** We note, with regard to the visit from appellant's family, that a visit from the defendant's girlfriend was rejected as an intervening circumstance by the majority in *Taylor,* supra. We find sufficient distinction between the gestalt of circumstances presented by the case before us, and the *Taylor* court's concern that the police used the girlfriend to prompt a confession by upsetting her with a disclosure of the appellant's grim future if he did not cooperate. *Id.,* 457 U.S. at 691–692, 102 S.Ct. at 2668.

**8.** Judge Clinton's concurring opinion emphasizes the language in *Taylor,* supra, regarding the *ex parte* nature of the arrest warrant. *Taylor* is ambiguous at best on this point: it holds that the filing of the arrest warrant was irrelevant as an intervening circumstance, but does not make clear if this is because it was based on

the illegally obtained fingerprints or because it was filed *ex parte,* while the defendant was being interrogated. *Id.,* 457 U.S. at 693–694, 102 S.Ct. at 2668. We agree with Judge Clinton's favorable comparison of the instant case with *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), but are not convinced that qualifying intervening circumstances must necessarily have an impact on the consciousness of the illegally arrested detainee. While it possesses some intuitive validity, this requirement risks confusing the voluntariness issue under the Fifth Amendment with the taint issue under the Fourth Amendment, so carefully delineated in *Brown,* supra. It also conflicts with some of our own applications of the *Brown* analysis. See *Foster,* supra, where Judge Clinton held that the defendant's status as a criminal defense attorney with presumptive *knowl-*

since the police had probable cause independent of the fruits of the illegal arrest, we believe it is immaterial that some of the evidence (including even the first confession) presented to the magistrate to justify the warrant might have been fruits of the illegal arrest.[9] We therefore conclude that, for Fourth Amendment purposes under the *Brown* analysis, the taint was removed by the events that transpired before the taking of the second confession. Therefore, the second confession and results of searches which occurred after the taint was removed were properly admissible, subject to a finding of voluntariness for Fifth Amendment purposes. Specifically, all evidence secured after the warrant was issued was admissible.

■ Addressing the Fifth Amendment question, we turn to appellant's assertion in his seventh and eighth grounds of error that the second confession (as well as the first) was involuntary. At this juncture, some factors relevant to the Fourth Amendment issue necessarily enter into the voluntariness issue under the Fifth Amendment, as the following remarks show:

> "In considering whether the first confession tainted the later ones we must examine factors such as whether the conditions that rendered the first confession inadmissible persisted through later questioning, the break in time, if any, between the confessions, whether defendant was given renewed *Miranda* warnings, and any other relevant circumstances.... That defendant initiated contact with the police prior to making the later confessions with the hope of making a deal also weighs in favor of finding the confessions admissible." *Holleman v. Duckworth,* 700 F.2d 391, 396 (7th Cir.1983).

Appellant here was rewarned after his first confession by a Justice of the Peace, and again immediately before making his second statement. He had considerable time to consider his position, and presumably discussed it with his relatives when they visited. He *initiated* further contact with Blanchard, and obviously had some notion of exculpation in mind since his second confession implicated an accomplice. That he remained in custody and did not consult (nor request to consult) with counsel certainly militate against admissibility, but we do not find that these factors outweigh the strong indications that the second confession resulted from a spontaneous, free-will decision by the appellant. See *Rawlings,* supra.

We recognize that appellant's involuntariness assertion raises, inter alia, the "cat out of the bag" theory, which stems from Justice Jackson's opinion in *United States v. Bayer,* 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947):

> "[A]fter an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. *He can never get the cat back in the bag. The secret is out for good.* In such a sense, a later confession may always be looked upon as fruit of the first. *But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed.*" *Id.* at 540–541, 67 S.Ct. at 1398. (Emphasis added.)

The Court in *Bayer,* supra, went on to hold a second confession voluntary and admissible, and implicitly held that the "cat out of the bag" theory is not always a controlling principle. See also *United States v. Hackley,* 636 F.2d 493, 502 (D.C.Cir.1980); *Holleman v. Duckworth,* supra.

edge of his Fifth Amendment *Miranda* rights would bear on the issue of voluntariness but would not qualify as an intervening event or circumstance for taint attenuation purposes; and *Townsley,* supra, which held that evidence obtained without the defendant's knowledge, and which gave the police probable cause against the defendant, sufficed to make subsequent confessions untainted.

9. The record is silent as to what evidence was actually given to the magistrate, but there is no challenge to the validity of the warrant based on whatever that evidence might have been.

We have rejected a "cat out of the bag" contention on the facts of at least one case. *Autry*, supra. There the incriminating admissions were made by the defendant to his mother over the telephone, and were overheard by a police officer. This occurred some six and one-half hours after the defendant signed his written statement, and the defendant argued that the cat was out of the bag at the time of the telephone conversation. We held that the telephone call was shown to be an act of free will, and not the result of interrogation. *Id.* at 765; *id.* at 766–767 (Clinton, J., concurring).

The United States Supreme Court confirmed this year that the "cat out of the bag" theory is of limited value. In *Oregon v. Elstad*, supra, the Court held that an initial, unwarned inculpatory statement does not bar the admissibility of a warned confession made shortly thereafter. After quoting the above passage from *Bayer*, supra, the Court noted that it "has never held that the psychological impact of voluntary disclosure of a guilty secret qualifies as state compulsion or compromises the voluntariness of a subsequent informed waiver." *Oregon v. Elstad*, 105 S.Ct. at 1295. Although the "cat out of the bag" theory holds some intuitive behavioral validity, we infer from this recent authority that it is not determinative of the case before us.

Further, appellant's desire to initiate the second confession confirms its voluntary nature and belies any suggestion that it was prompted by the fact that he had already confessed once. The workings of the human mind are too complex to infer such a motivation without any objective evidence thereof. Certainly, there is nothing manifest in the record to suggest that appellant was prompted by "cat out of the bag" thinking. See and cf. *Cagle v. State*, 45 Ala.App. 3, 4, 221 So.2d 119, 120 (1969), *cert. denied*, 284 Ala. 727, 221 So.2d 121 (1969) (suspect prefaced second statement with "I have already give [sic] the Chief a statement and I might as well give one to you, too").

Appellant also asserts that he was brutalized and coerced, and that he did not actually write out either of the statements himself. We take note of the examining physician's testimony that no physical abuse was apparent, and that all of appellant's testimony regarding such coercion was addressed to the first confession only. Finally, the confessions clearly relate what appellant told to the officers. The law does not require that a confession be in the exact language of the accused. *Knight v. State*, 538 S.W.2d 101, 106 (Tex.Cr.App. 1975).

We conclude that appellant's second confession was voluntary under the Fifth Amendment and untainted under the Fourth Amendment, along with all evidence secured after the taint was removed by issuance of the warrant, and therefore admissible. The first confession should have been excluded as a fruit of the illegal arrest, along with the extension cord ends and the container of coins that were found in the first search of appellant's residence. The latter two articles of evidence, however, clearly would have been recovered in one of the later, untainted searches of appellant's residence. They were therefore admissible under the rationale of inevitable discovery. See *Miller v. State*, 667 S.W.2d 773, 778 (Tex.Cr.App.1984), and cases cited therein.

Appellant's second confession was essentially the same as the first confession, except that the second inculpated Sheperd Watson as an accomplice in the murders and the check-cashing attempt, and added that Watson and appellant raped Mrs. Chisum before choking her to death. "Since the second confession is more complete with details and it was properly admitted in evidence, the admission of the first confession is not reversible error." *Daniel v. State*, 668 S.W.2d 390, 392 (Tex.Cr.App. 1984). Appellant's grounds of error numbers 6, 7 and 8 are overruled.

We now turn to appellant's grounds of error numbers 1 through 4, which involve jury selection. Ground of error number 1 asserts that the trial court erred in granting the State's challenge for cause of ve-

nire member Beatrice Garcia, in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Appellant maintains that Garcia merely wanted out of the proceedings, and that she did not meet the standards established by this Court in *Williams v. State,* 622 S.W.2d 116 (Tex.Cr.App.1981), *cert. denied,* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982), which was relied on by the trial court in granting the challenge to Garcia.

In *Williams,* supra, we found that the challenged venire members' views about capital punishment would have "prevented or substantially impaired the performance of their duties as jurors in accordance with their instructions," *id.* at 118, using the standard described in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). That standard has since been declared preferable to the stricter standard of *Witherspoon,* supra, by the Supreme Court in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). "[T]he proper standard for determining when a juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.,* 105 S.Ct. at 852, quoting *Adams,* supra.

This clarified standard dispenses with *Witherspoon*'s reference to a juror's "automatically" voting against the death penalty, and does not require that a juror's bias be proved with "unmistakable clarity." See *Witt,* supra, 105 S.Ct. at 852. It recognizes that such bias is not susceptible to unmistakably clear proof through the voir dire process, and that venire members may be reticent, inarticulate, or unsure of how they would react when faced with imposing the death sentence. See *id.* Finally, it makes clear that "whether or not a venireman *might* vote for death under certain *personal* standards, the State still may properly challenge that venireman if he refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge." *Id.,* 105 S.Ct. at 851.

In the case before us, Garcia repeatedly stated that she did not believe in the death penalty and that she could not be a part of the process of assessing it. But when pressed by counsel for appellant as to whether there were any conceivable circumstances under which she could answer "yes" to the death penalty questions, she responded at one point: "Let me just say, I don't go with this. I want out of this. I don't want no part of it." She also became less definite in her opinion at times, stating that she "didn't think" she could assess the death penalty, and that if her own child were the victim, she did not know how she would react.

We conclude that her testimony meets the standard of *Adams, Williams,* and *Witt,* supra, and that the trial judge did not err in granting the State's challenge. Although there is some indication that she simply wanted out of the responsibility of the proceedings, as appellant maintains, it is also clear (if not "unmistakably" clear) that her opposition to the death penalty would substantially impair her performance as a juror. Her equivocation ("I don't think so") does not alter this conclusion. See *Vanderbilt v. State,* 629 S.W.2d 709, 725–730 (Tex.Cr.App.1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 169 (1981). Nor does her ability to consider imposing the death penalty in response to hypothetical circumstances involving her own family. See *O'Bryan v. State,* 591 S.W.2d 464, 478 (Tex.Cr.App. 1979), *cert. denied,* 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 (1980); *Sanne v. State,* 609 S.W.2d 762 (Tex.Cr.App.1980), *cert. denied sub nom. Skillern v. Texas,* 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 432 (1981), *reh. denied sub nom. Skillern v. Texas,* 453 U.S. 928, 102 S.Ct. 890, 69 L.Ed.2d 1023 (1981). Appellant's first ground of error is overruled.

Appellant's second ground of error asserts that the trial court erred in excusing venire member James Riley on its own motion. The record reflects that Riley failed to reappear for the general impanelling process, an attachment was issued, and the witness coordinator was assigned by

the court to determine his status. Appellant's counsel objected to the coordinator's report as hearsay, because it consisted only of the coordinator's discussion with Riley's father. The report was that Riley's wife was in the hospital in Jefferson County, but her condition worsened and she was transferred by ambulance to Hermann Hospital in Houston, with Riley accompanying her. Appellant's counsel objected to Riley's excusal by the court and requested that further evidence be considered, but offered none, and the objection and request were overruled.

Appellant objects that the evidence was inadequate to support a showing of disqualification under Art. 35.16, V.A.C.C.P., and cites the well settled rule that a trial judge should not exclude a prospective juror for cause unless it is shown that the prospective juror is absolutely disqualified. See *Martinez v. State,* 621 S.W.2d 797 (Tex.Cr. App.1981); *Esquivel v. State,* 595 S.W.2d 516 (Tex.Cr.App.1980), *cert. denied,* 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980); *Payton v. State,* 572 S.W.2d 677 (Tex.Cr.App.1978). We note that this situation is unique and irregular, but resembles a discharge for an "excuse" under Art. 35.03, V.A.C.C.P., more than it does an excusal for disqualification under Art. 35.-16, V.A.C.C.P. Resolution of the issue, however, need go no further than an examination of the lack of harm to appellant. See *Goodman v. State,* 701 S.W.2d 850 (Tex.Cr.App.1985).

Before addressing appellant's specific contention, we will make a brief recitation of the rules regarding jury selection and the harm a defendant must show in order to merit reversal. If a trial court erroneously overrules a defendant's challenge for cause, the defendant may establish harm by showing: (1) exhaustion of his peremptory challenges; (2) denial of a request for additional peremptory challenges; and (3) the seating of a juror upon whom the defendant would have exercised a peremptory challenge. *East v. State,* 702 S.W.2d 606 (Tex.Cr.App.1985); *White v. State,* 629 S.W.2d 701 (Tex.Cr.App.1981), *cert. denied,* 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982); *Hernandez v. State,* 563 S.W.2d 947 (Tex.Cr.App.1978); *Payton,* supra. In non-capital murder cases, if the trial court erroneously grants a State's challenge for cause and excludes a qualified juror, the defendant may establish harm simply by showing that the State exhausted all of its peremptory challenges. In such a case the court has effectively given the State the benefit of an additional peremptory challenge. *Payton,* supra. See also *Culley v. State,* 505 S.W.2d 567 (Tex.Cr.App.1974); and *Weaver v. State,* 476 S.W.2d 326 (Tex. Cr.App.1972). In capital murder cases, if the trial court improperly sustains a State's challenge for cause and excludes a qualified juror, over a defendant's objection, reversible error arises regardless of whether the State has exhausted its peremptory challenges. This is because peremptory strikes are exercised after each prospective juror is questioned, under Art. 35.13, V.A. C.C.P., as opposed to after the entire panel is questioned in a non-capital case. *Grijalva v. State,* 614 S.W.2d 420 (Tex.Cr.App. 1981). See also *Turner v. State,* 635 S.W.2d 734 (Tex.Cr.App.1983).

These rules, dealing with a trial judge's erroneous ruling on a challenge for cause must be distinguished from the cases where, as here, a prospective juror was excused by the trial judge *sua sponte.* When the court *sua sponte* excludes a *disqualified* juror—one who is subject to challenge for cause—a showing that the State has used all its peremptory challenges will not suffice to show the defendant was harmed by the court's action. The defendant must establish that he was tried by a jury to which he had a legitimate objection. *Goodman,* supra at 856; *Esquivel,* supra; *Henriksen v. State,* 500 S.W.2d 491 (Tex. Cr.App.1973).

When the trial court *sua sponte* excludes a *qualified* juror, the situation must be distinguished from a similar excusal that is prompted by the State. *Grijalva,* supra, held that any State's unused peremptory strikes remaining at the end of voir dire would not remove the harm of an erroneous excusal of a qualified juror. This conclusion is based on the notion that otherwise the State would receive three unfair

advantages over the defense: (1) hindsight in exercising peremptory strikes that was denied to the defense; (2) the benefit of striking last that is statutorily given to the defense by Art. 35.13, V.A.C.C.P.; and (3) the benefit of having the court strike, on behalf of the State, a venireman on appeal after voir dire error has been pronounced. But *Grijalva* is founded on the notion that the State *caused* the improper excusal by issuing a challenge for cause, and is therefore penalized because of the advantages it would otherwise receive by holding a peremptory strike back. Where the trial judge, not the State, is solely responsible for the improper excusal, the justification for penalizing the State under *Grijalva* disappears. It is entirely appropriate in such a case to fall back on the rationale in *Weaver*, supra, *Payton*, supra, and *Culley*, supra, and assess harm to the defendant on whether the state had remaining peremptory strikes left at the close of the voir dire.

In the case at bar, the State had remaining at the conclusion of jury selection a total of one peremptory strike. Unlike *Grijalva*, however, the venire member in this case was not excused via challenge for cause by the State. The trial judge excused him *sua sponte*. The State in no way prompted the erroneous excusal nor did it have an opportunity to timely exercise a peremptory challenge against him had it wished to. In short, this venire member was never passed first to the State and then to the appellant for challenges according to the requirements of Art. 35.-13, V.A.C.C.P. Thus, the "corruption of the peremptory strike practice" that gave the State "an unfair advantage," so condemned in *Grijalva*, supra at 424, is absent from this case.

■ Appellant has not demonstrated that he was harmed in any way by the trial court's exclusion of a prospective juror who failed to surrender himself for voir dire examination. Appellant did not have to exercise a peremptory strike in order to prevent a disqualified juror from sitting on the jury, nor was appellant forced to accept an objectionable juror in the prospective juror's place. Since appellant has failed to

establish that he was harmed by the exclusion of the absent prospective juror, the trial court did not abuse its discretion in excluding the prospective juror. *Culley*, supra; *Weaver*, supra. Appellant's second ground of error is overruled.

■ Appellant's third ground of error alleges that the trial court erred in failing to grant appellant's challenge for cause of venire member Ouida Branch. Appellant used all of his peremptory strikes and one additional strike, but was not granted a second strike. Appellant was then forced to accept an objectionable juror when a subsequent challenge for cause was denied, so that any error in denying his challenges for cause was properly preserved. *Hernandez*, supra.

In response to questioning by defense counsel, prospective juror Branch stated, "I think I would find him guilty, if he didn't come forward with anything." The State then explained the burden of proof and the defendant's right not to testify, and obtained Branch's agreement that she would not hold a failure to testify or put on evidence against the defendant. On further questioning by defense counsel, Branch indicated that her decision to require some evidence from a defendant would depend upon the seriousness of the case. The State again discussed its burden with the prospective juror, and obtained her understanding and commitment not to hold the defendant's failure to put on evidence against him.

This sequence of challenge and rehabilitation, revolving around the defendant's failure to present evidence, is similar to that in *Scott v. State*, 490 S.W.2d 578 (Tex. Cr.App.1973), where we found no error in the court's denial of the defendant's challenge for cause. See also *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr.App.1980), *cert. denied*, 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981). There was also some confusion apparent in Branch's testimony, similar to that in *Barefoot*, supra at 881–882. In *Barefoot*, the prospective juror seemed to confuse the defendant's right to remain silent with his right to effective assistance of counsel. Here,

Branch stated that she was confused by the questioning that initially led to her statement that she would require the defendant to put on evidence. Her confusion was apparent at this point:

"Q. [defense counsel] ... would you require some proof of the accused in some manner prior to finding them not guilty?
A. Yes, because I believe, here, in this state, that you are innocent until you are proven guilty. Right?"

 This statement and others—those elicited by the State—make it clear that Branch, although confused by some of the questions, understood and would apply the presumption of innocence and would not hold any failure to testify against appellant. We accord due deference to the trial court given its position to gauge the prospective juror's demeanor. Considering the voir dire in its entirety, we cannot say that the trial court abused its discretion in denying the challenge. *Goodman,* supra, and cases cited therein at p. 859. There was no error in rejecting appellant's challenge, and his third ground of error is overruled.

 The fourth ground of error similarly attacks the trial court's failure to excuse venire member Helen Head for cause. The prospective juror testified that she had read about the case back in 1974, but that she did not remember too many of the facts and it would not influence her. When pressed by defense counsel to articulate the impression she received from the papers, she stated, "I guess he is more guilty [than not guilty], if I have to choose one of the two." Then:

"Well, I believe that it has to be proven—have evidence to prove someone is guilty, but by reading the paper, I can come in and decide whether he is guilty or innocent by the evidence, but, you know, if you're asking me what I read in the paper, if I felt like he was guilty or innocent, I felt like he was guilty by the paper,—account."

She then reconfirmed that her impression from the paper would not affect her deliberations over issues of fact.

In *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the Supreme Court said:

"The constitutional standard of fairness requires that a defendant have 'a panel of impartial, "indifferent" jurors.' *Irwin v. Dowd,* supra, 366 U.S. [717] at 722, 81 S.Ct. [1639] at 1642, [6 L.Ed.2d 751]. Qualified jurors need not, however, be totally ignorant of the facts and issues involved.

'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' Id.,* at 723, 81 S.Ct. at 1642."

See also *Freeman v. State,* 556 S.W.2d 287, 293 (Tex.Cr.App.1977).

Clearly, prospective juror Head demonstrated that what little she remembered about the case could be set aside so that her verdict would be based solely on the evidence. Appellant also claims, without citing any specific reference in the record, that Head exhibited a bias or prejudice against the presumption of innocence. We find to the contrary, that Head stated that she would follow the law and would not require any evidence of the defendant. See *Scott,* supra. Appellant's fourth ground of error is overruled.

During the jury selection process, articles appeared in the newspapers which quoted a federal judge as feeling that appellant was guilty of the murder of Mrs. Chisum. Federal District Judge Parker's comments were made in connection with a hearing on a post-conviction writ attacking appellant's 1974 death sentence for the killing of Mrs. Chisum. See *Bell v. State,* 582 S.W.2d 800 (Tex.Cr.App.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3145, 69 L.Ed.2d 995 (1981), *reh. denied,* 453 U.S. 927, 102 S.Ct. 889, 69 L.Ed.2d 1022 (1981). Appellant's fifth ground of error complains of the trial court's refusal to allow defense counsel to question the seven jurors already selected

concerning this publicity. Defense counsel introduced four of the news articles into evidence, and his requests to question the already selected jurors were denied.

Appellant's single authority is *Henley v. State*, 576 S.W.2d 66 (Tex.Cr.App.1978). There we reversed and remanded a conviction because the trial court refused to conduct a pretrial evidentiary hearing on the defendant's controverted motion for a change of venue. The trial court's denial of the motion was predicated upon the successful qualification of a jury panel, which confused the grounds for change of venue with the grounds for juror challenge for cause. *Id.*, at 70. The trial court ignored many relevant factors in determining "whether outside influences affecting the community climate of opinion as to a defendant are inherently suspect," *id.*, at 71, and was only concerned with whether it was possible to draw veniremen who would testify on voir dire that they would give defendant a fair trial, uninfluenced by what they had seen or heard outside the courtroom.

Although the issues are similar, our decision in *Henley*, supra, is not controlling of the issue raised by appellant. Appellant here was granted a pre-trial hearing on his motion to change venue in compliance with Arts. 31.03 and 31.04, V.A.C.C.P., which were violated by the trial court in *Henley*, supra.

After the hearing in which the motion to change venue was denied, and after seven jurors had been selected, defense counsel first raised the issue of the newspaper articles; the State does not controvert that this was the first opportunity, because the articles had just been published. The issue was then repeatedly raised during voir dire, in the context of reurging the motion to change venue, a motion for mistrial, and a request to examine the previously selected jurors regarding any prejudice stemming from the articles. The trial court expressed concern about the effect of the articles, but denied all defense motions and requests for the time being. At the end of voir dire, the trial court again denied all of the defense motions and noted that the

seven jurors had been instructed when they were impanelled not to read anything about the case. The court also saw no justification for the defense request to bring back the seven jurors in light of the fact that none of the twenty-five members of the second panel, which was seated after the articles were published, had read the articles. The court concluded the issue by telling defense counsel that he would have the opportunity to examine the seven jurors at some time before the trial was over. The matter was not raised again.

Appellant's ground of error, though couched in terms of trial court error, resolves into an issue of claimed jury misconduct. As such, it should have been raised by a motion for new trial under Art. 40.03(8), V.A.C.C.P. See *Barrington v. State*, 594 S.W.2d 88 (Tex.Cr.App.1980). Appellant effectively asks us to presume misconduct, as well as harm, which we decline to do. See *Haynes v. State*, 627 S.W.2d 710 (Tex.Cr.App.1982) (defendant failed to demonstrate harm, by failing to show that remark by sheriff was overheard by prospective jurors).

In addition, the trial court instructed the jury panels not to read about or listen to anything concerning the trial. This is the preferred method for dealing with the problem of juror exposure to publicity. See *Barrington*, supra, citing *Broussard v. State*, 505 S.W.2d 282, 284 (Tex.Cr.App.1974). Appellant has failed to show any prejudice or injury, and his fifth ground of error is overruled.

In grounds of error nine and ten, appellant argues that in-court identifications by witnesses Sue Foery and Bonnie Wilkerson should have been excluded as tainted. Appellant's argument is that both witnesses were shown a picture of appellant prior to seeing the line-up, and that the line-up itself was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," citing *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Photographs of the six member line-ups, which are in the record, show that appellant is the only person in bright white pants, he is the

tallest of the group, his number is underlined, and a triangle mark appears over his number alone.

In *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court rejected a per se exclusionary rule where the identification procedures were found to be unnecessarily suggestive, adopted a more lenient rule whereby the challenged evidence would be admissible if it possessed certain "features of reliability," *id.*, 432 U.S. at 110, 97 S.Ct. at 2251, and stated that, "reliability is the linchpin in determining the admissibility of identification testimony." *Id.*, 432 U.S. at 114, 97 S.Ct. at 2253. The factors to be considered include the witness' opportunity to view the defendant during the commission of the offense, the witness' degree of detention, the accuracy of the prior description of the accused, the level of certainty of the identification, and the amount of time between the crime and the confrontation. See *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Munguia v. State*, 603 S.W.2d 876, 878 (Tex.Cr.App. 1980).

■ Foery and Wilkerson were the bank tellers who dealt with appellant when he attempted to cash a check on the Chisum account. Both testified that: the lighting was good; they got a very good look at appellant for at least three minutes at close range; they were suspicious of appellant, so they were doing everything they could to notice his description; and Wilkerson stood next to appellant, so Foery could accurately gauge his height. They also both testified that their line-up identification was (and their in-court identification would be) based on their observations at the bank and that nothing about the line-up appeared suggestive; neither noticed the marks on appellant's number card. With such testimony, there was clearly no error in admitting their in-court identification. Appellant's ninth and tenth grounds of error are overruled.

In his eleventh ground of error, appellant alleges that the trial court erred in allowing the State to introduce the fact that appellant was indicted for the capital murder in question as evidence of his guilt. The State elicited testimony from the District Attorney's investigator, Calise Blanchard, that he presented the Chisum case to a grand jury. Appellant's objection was overruled as premature. The State proceeded to ask the person's name who was indicted, Blanchard responded that it was appellant, and appellant's objection was again overruled. The State was then allowed to repeat the question and answer, after which it proceeded to ask about the forgery offense. Over appellant's objection, Blanchard stated that appellant and Sheperd Watson were indicted for the forgery of the Chisum's check. Blanchard then was asked to repeat that appellant alone was indicted for the capital murder.

Art. 38.03, V.A.C.C.P., dealing with the presumption of innocence, provides in part that the fact that a person "has been arrested, confined, or indicted for, or otherwise charged with, the offense gives rise to no inference of guilt at his trial." This language is repeated verbatim in V.T.C.A. Penal Code, § 2.01, which requires the burden of proof beyond a reasonable doubt.

The State argues that the above evidence was tendered by the State to show that the police had followed up all leads in the case and did not ignore appellant's assertion to them that Watson was involved in the homicide. Blanchard's testimony was thus relevant to counter appellant's allegations on the witness stand of a "frame-up," to show that the officers considered and investigated the full story told by appellant at the time of the investigation, and that they would also have investigated the claims that appellant made at trial, if they had been made during the investigation. This explanation is bolstered by the record of appellant's testimony, and by the manner in which the evidence of the indictments was presented.

■ It was error, however, to allow the (repeated) admission of appellant's indictment for the offense in question, in light of the Code provisions cited above. The State could have responded to appellant's allegations simply by questioning its investigators as to whether all leads were pursued,

and leaving it up to the jury to determine the credibility of the testimony. Although we find no cases directly on point, we find that the error was harmless in light of the court's instructions in its charge that the indictment was not to be considered as evidence of appellant's guilt. This holding is supported by our decisions in *Wood v. State*, 515 S.W.2d 300 (Tex.Cr.App.1974) and *Minafee v. State*, 482 S.W.2d 273 (Tex.Cr.App.1972). In those cases the practice of delayed reading of indictments and conducting such proceedings in front of the jury was condemned, but the error was found to be harmless in light of the totality of the circumstances, including the court's instruction to the jury that the indictment was no evidence of guilt. In this case the error was also not reversible, and appellant's eleventh ground of error is overruled.

Appellant's ground of error number twelve argues that a mistrial should have been granted when a State's witness introduced inadmissible testimony before the jury. The State introduced one thumbprint into evidence, with testimony identifying it as being found at the crime scene and a description of how it was identified as appellant's print. The following colloquy occurred:

"Q. [THE STATE] ... Is it common in the fingerprint field after an identification or a rap has been made that the print is given to somebody else for a, like, a second opinion, like doctors do?

A. Yes, sir.

Q. And did you do that with this print?

A. Yes, sir, I did.

Q. Who did you have to examine it?

A. I sent it to a latent fingerprint expert in Austin, Texas. He's with the Department of Public Safety, and—

Q. And were your findings confirmed?

MR. LAINE [Defense Counsel]: Objection, Your Honor. That's absolute hearsay? [sic]

THE COURT: Sustained.

MR. LAINE: We ask that—that question—that the jury be instructed to disregard that.

THE COURT: The jury is so instructed.

MR. LAINE: We move for a mistrial.

THE COURT: Denied.

Q. But you had it sent it [sic] on to a second expert, is that correct?

MR. LAINE: Objection, Your Honor. It's an attempt to come into the back door with the same thing the District Attorney was denied doing.

THE COURT: Overruled, to that question.

Q. You can answer that last question.

A. <u>I did get a verification on that.</u> [emphasis supplied]

MR. LAINE: Objection, Your Honor.

THE COURT: That's sustained. Ladies and gentlemen, disregard that. Officer, that was not the question. Please—(interrupted).

MR. LAINE: We move for a mistrial, Your Honor.

THE COURT: That's denied. Mr. Laine.

A. Can I have the question, again, please?

Q. The question is 'Did you send it to another expert to have him look at it?'

A. Yes, sir, I did."

As appellant argues, the law is clear that an expert witness cannot testify to the results of a test conducted by some other expert not under the witness' direction or control. *Jones v. State*, 611 S.W.2d 64 (Tex.Cr.App.1981); *Roberts v. State*, 537 S.W.2d 461 (Tex.Cr.App.1976).

■ The State argues that the underlined response could be construed as an answer that the witness did indeed send the print to another expert *for* verification, rather than an assertion that the witness' opinion (that it was appellant's print) was confirmed by the second expert. This argument belies the fact that the question, whether the print was examined by another expert, was itself improper, as simply an attempt to imply to the jury that the second expert confirmed the analysis. Such a question would only be proper as a predicate to introducing the second analysis under an acceptable evidentiary rule. It has

no other relevance and is, by itself, an attempt to bolster the testifying expert's testimony.

The State also points out that a second expert (not the one referred to in the above testimony) was placed on the stand and testified that the same print was appellant's. Therefore, the State argues, any impropriety in the question and answer was rendered harmless by the prompt and specific instruction of the trial court to disregard. Although the questioning by the prosecutor was so improper as to seem an intentional effort to thwart the rules of evidence, we reluctantly agree with the State's analysis concerning harm: in light of the other evidence before the jury, we do not find the question and the answer, the latter of which was removed from the jury's consideration, to be reversible error. See *Richardson v. State,* 624 S.W.2d 912 (Tex.Cr.App.1981); *Ridyolph v. State,* 545 S.W.2d 784, 787 (Tex.Cr.App.1977) and cases cited therein. Appellant's twelfth ground of error is overruled.

 Appellant's grounds of error numbers thirteen and fourteen complain of the prosecutor's jury argument in the guilt/innocence phase of the trial. Ground of error thirteen is addressed to the following argument:

"... All we ask, from the D.A.'s point of view,—all we ask is that you evaluate the evidence and use your common sense. The only danger there ever is in a case like this is that one or two jurors might let the defense argument carry them beyond their common sense.

Now, sometimes things get pretty hot and heavy in this courtroom, and things get confused, and we do it everyday. I live in this courtroom, but in a trial things get confused and sometimes you just don't put things in the proper perspective, but there's a way you can avoid getting yourself caught up in that. Just take yourself and mentally remove yourself when you are in there in the jury room, or whatever, remove yourself to your home, where with a little luck we will be before the end of the week—remove yourself to your home and think about you talking to your friends and your neighbors, people who have not been involved and caught up in this hot atmosphere, but who's [sic] still maintained and managed to maintain their common sense. Remove yourself to your home and think about talking to the, [sic] and they will ask you, and remember and think about how they will ask you at the end of case when it's all over."

Appellant's objection at this point was overruled, and the prosecutor continued to discuss, over objections, how the jurors' neighbors and friends would react to the evidence, using their common sense. Appellant maintains that this argument impermissibly urged the jurors to base their verdict upon the desires of members of the community, relying upon cases in which the jury was told that the community "expects," or "wants," or "is asking" the jury to convict or render a given punishment. See *Cortez v. State,* 683 S.W.2d 419 (Tex. Cr.App.1984) and cases cited therein; *Prado v. State,* 626 S.W.2d 775 (Tex.Cr.App. 1982).

The above argument is similar to, and even less questionable than, an argument which did not require reversal in *Whittington v. State,* 580 S.W.2d 845 (Tex.Cr.App. 1979). There the prosecutor stated:

"... The twelve of you were selected to represent the people in Harris County and the State of Texas. Your friends and neighbors. After you leave this trial, your friends and your neighbors are going to ask you what happened.... Now, you—and as you think about that, think about it right now. Because I think you will want to give them an answer you can be proud of, that your friends and neighbors can be proud of." *Id.* at 847.

We found this to be a permissible plea for law enforcement rather than an attempt to induce the jury to convict because the people of the community desired or expected a conviction, and noted that it is common knowledge that friends and neighbors will ask about the jury experience. *Id.* The statements objected to by appel-

lant do not go as far as the argument in *Whittington,* supra. They are part of a summary of the evidence, a request to the jury to take their common sense into the jury room with them, and a plea for a verdict based on logic rather than emotion. The prosecutor did not assert or imply that the community demands or expects a conviction. Appellant's thirteenth ground of error is overruled.

Appellant's ground of error number fourteen complains of an earlier portion of the prosecutor's closing argument, as being so manifestly improper and prejudicial that it denied appellant a fair trial. The objectionable argument dealt with the strict procedural rules that govern criminal trials, beginning with a reference to the possibility that an appellate court could reverse the case and have it retried. Appellant's objection was sustained and the argument proceeded to refer to the tedious procedures for admission of evidence, including the statement that, "the State and the Defense may both make objections during the trial to keep evidence out. We, the District Attorney's Office in this case made very few objections in this case." The prosecutor then made repeated references to defense counsel's many objections during the trial, and argued to the court that "there may be during the course of the trial things that you like us to ask, questions you would like us to ask, and there may be testimony that we would like to bring out, but we cannot." During this portion of the argument defense counsel made repeated objections and requests that the jury be instructed to disregard, which were sustained by the court, although the motions for mistrial were denied. The prosecutor's discussion of procedure continued with references to the "incongruity" of our legal system: "we're dealing here with the deaths of Ferd and Irene Chisum, and there is nobody—there was nobody to protect their Constitutional Rights, like Walter Bell;" "[n]obody was there to raise procedure of technicality;" and, "[n]obody—essentially, they could not appeal their death sentence to a higher court." This line of argument was closed with the following:

"Now, these are the rules we have to abide by and we're going to do and we have to do it. This is the society and the civilization that we have created in the Twentieth Century. We must, and we will, follow those procedural rules and we still, despite those limitations, see that justice is done in this case."

Objections to the references to the Chisum's constitutional rights and to the above paragraph were overruled.

Appellant argues on appeal that this was a continuous effort by the State to create the false impression in the jurors' minds that appellant's attorneys were engaged in improper legal chicanery to prevent an honest trial, rather than simply assisting appellant to exercise his rights, and was thus an effort to inflame the jury against appellant and his counsel. Appellant cites cases where the prosecutor: referred to the defense counsel's tactics as "trickery," *Cook v. State,* 537 S.W.2d 258 (Tex.Cr.App.1976); said that defense counsel would lie and did not have the guts to argue that the defendant was innocent, *Anderson v. State,* 525 S.W.2d 20 (Tex.Cr.App.1975); or argued that the defendant and his counsel were lying, *Lopez v. State,* 500 S.W.2d 844 (Tex. Cr.App.1973).

The State maintains that the argument was an explanation of and apology for the complex and tedious procedures for admitting evidence, coupled with a request that the jury not draw adverse inferences against the State for failing to introduce evidence that they might speculate to be available. The State also points out that the prosecutor noted that *both* sides in a case are guided by strict procedural rules, and that the defense made objections "as is their right." Finally, the State argues, and we agree, that the prosecutor did not directly accuse the defense of trickery, never directly asserted that there was any specific evidence which would have been revealed but for defense objections, and never made a direct or personal attack on the conduct or tactics of appellant or his counsel.

 Though not an exhaustive list, there are four general categories of permissible jury argument: (1) summation of

the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or, (4) plea for law enforcement. *Todd v. State*, 598 S.W.2d 286 (Tex.Cr.App.1980); *Alejandro v. State*, 493 S.W.2d 230 (Tex.Cr.App.1973). The argument complained of does not fit into any of the four categories, nor any other approved category, and was improper. While it is not as bland as the State would characterize it, the argument is also not necessarily as prejudicial as appellant insists it is. We must consider whether it constitutes reversible error, that is, whether in light of the record as a whole the argument is extreme or manifestly improper, is violative of a mandatory statute, or injects new facts, harmful to the accused, into the trial proceedings. *Brandley v. State*, 691 S.W.2d 699 (Tex.Cr.App.1985); *Goocher v. State*, 633 S.W.2d 860 (Tex.Cr.App.1982), *app. dism'd.*, 459 U.S. 807, 103 S.Ct. 32, 74 L.Ed.2d 46 (1982); *Todd*, supra.

■ Similar arguments, while not condoned, have been upheld as harmless in other cases. See *Franklin v. State*, 41 Tex.Cr.R. 21, 51 S.W. 951 (Tex.Cr.App. 1899) (prosecutor belittled defense counsel's taking a bill of exceptions); *Mims v. State*, 466 S.W.2d 317 (Tex.Cr.App.1971) (prosecutor implied that he knew more about the accused than the jury was told); *Linzy v. State*, 478 S.W.2d 950 (Tex.Cr. App.1972) ("that's what the officer testified to, and that's where the testimony has to end, for reasons that we can't go into"); *Thompson v. State*, 480 S.W.2d 624 (Tex. Cr.App.1972) (reference to the right of both parties to bring additional evidence at the punishment stage); and *Little v. State*, 567 S.W.2d 502 (Tex.Cr.App.1978) ("there is a good reason why he is not pleading guilty, and unfortunately, I am not permitted to tell you what it is"). Although we strongly disapprove of the argument used in this case, we have examined the record and do not find that the argument was so egregious as to constitute . reversible error. Also, the possible injury to appellant was obviated by the trial court's sustaining some of the defense objections and issuing instructions to disregard. See *Franklin v. State*, 693 S.W.2d 420, 429 (Tex.Cr.App.

1985); *Brandley*, supra at 713. Appellant's fourteenth ground of error is overruled.

In his fifteenth and final ground of error, appellant argues that the evidence was insufficient to sustain a finding that there was a probability that he would commit future criminal acts of violence that would constitute a continuing threat to society. See Art. 37.071(b)(2), V.A.C.C.P. The State's evidence consisted primarily of that produced at the guilt or innocence stage of the trial. The State also introduced military records indicating that appellant was court-martialed for saying to an officer, "shut your mouth or I'm going to kill your ass," and a disciplinary report from the Texas Department of Corrections indicating that appellant threatened a correctional officer; the officer also testified about the incident. Appellant introduced testimony to the effect that he was basically non-violent, quiet, easily led, and soft-hearted.

■ Appellant points out that the State failed to produce evidence of prior convictions or extraneous criminal acts, and did not present adverse character evidence or psychiatric testimony. Although appellant recognizes that the facts of the offense itself may be considered as probative in the punishment phase, he argues that the State is still required to put on sufficient evidence to support an affirmative finding beyond a reasonable doubt. This statement is incontrovertible, but it appears that appellant is arguing that the offense itself cannot be enough to sustain an affirmative finding on Special Issue Two, Art. 37.-071(b)(2), V.A.C.C.P. We have held otherwise, that the circumstances of the offense, .if severe enough, can be sufficient to support the affirmative finding. *Landry v. State*, 706 S.W.2d 105 (Tex.Cr.App.1985); *Holloway v. State*, 691 S.W.2d 608 (Tex.Cr. App.1984). Furthermore, the calculated nature of the offense and the forethought with which it was planned and executed is probative of the propensity to commit future acts of violence. *Landry*, supra; *O'Bryan*, supra.

■ The evidence at the guilt stage demonstrates that appellant's crime was planned in advance, with violence anticipated beforehand; it also shows that the violence escalated in stages, with several opportunities for appellant to desist. Appellant carried with him to the Chisums' house an "equipment kit," with a sharpened knife, handcuffs, and an electrical cord with the ends cut off. He gained entry to their home under a pretext, and discussed with Mr. Chisum the possibility of getting into mechanic's school. He then pulled a knife on Chisum, put the cuffs on him, bound his feet and put him in a closet. Appellant next found Mrs. Chisum and attempted to gag her and tie her up, but when Mr. Chisum escaped from the closet, appellant stabbed him in the chest and retied him. After that, he untied Mrs. Chisum's legs, made her remove her brassiere and panties, and raped her. He then forced her to write out some checks, hit her in the jaw, and attempted to choke her to death with a towel. He dragged her into the bathroom, where she struggled, but he succeeded in killing her. Appellant then returned to Mr. Chisum, choked him, dragged him to the bathtub and stabbed him again in the abdomen. This sequence of events indicates a propensity, perhaps even an appetite, for violence.

The next day appellant spent the spoils of his crime on clothing and beer, attempted to cash the checks, played pool, and generally enjoyed himself. There was no hint of remorse or contrition prior to his arrest. There was also no evidence that he was provoked by the victims, or was acting under the domination of anyone else.

Considering this evidence alone, without the threats presented by the State in the punishment stage, we find sufficient support for the jury's affirmative finding to Special Issue Two. Appellant's fifteenth ground of error is overruled.

Finding no reversible error, we affirm the judgment of the trial court.

TEAGUE, J., dissents, but especially dissents to the disposition of ground of error no. 6 and also ground of error no. 15.

CLINTON, Judge, concurring.

In addressing appellant's sixth ground of error, the Court correctly resorts to *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and its progeny. However, in my judgment, its finding that "after the warrant was obtained the causal relationship between the illegal arrest and subsequent evidence was severed" is unsound in light of the seminal decision the majority purports to follow, namely, *Wong Sun v. United States*.[1]

*Wong Sun* examined circumstances in which Toy made statements to officers in his bedroom to determine whether his making them was "sufficiently an act of free will to purge the primary taint" of an invasion violative of the Fourth Amendment. 371 U.S. at 486, 83 S.Ct. at 416–417. The rationale is that the primary taint of an illegal arrest bears so strongly on the will of a detainee that evidence "come at by exploitation of that illegality ... may not be used," 371 U.S. at 488, 83 S.Ct. at 417. Therefore, exploitation of an unauthorized arrest to obtain a confession is, by definition, that which is calculated to affect the will of an arrestee enough to produce a confession.

It follows that events and circumstances having no impact upon the consciousness of one illegally confined after an unlawful arrest are of no consequence in determining whether the primary taint has been purged. The mere fact that a warrant was obtained while appellant remained in custody could not sever a relationship between the illegal arrest and his subsequent confession. While procurement of a warrant might be considered an "event," for it to have any impact on his will surely appellant must at least become aware that the "event" has occurred. Otherwise, as found

1. With deference, I point out that the Supreme Court did not use the phrase "as a direct result of" in relation to "verbal evidence" but only to tangible materials, *viz:* "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." 371 U.S. at 485, 83 S.Ct. at 416.

in *Taylor v. Alabama,* obtaining a warrant is "irrelevant to whether the confession was the fruit of the illegal arrest," 457 U.S. at 693, 102 S.Ct. at 2668.[2]

Clearly, that the warrant was based on fruits of an illegal arrest is not the reason the *Taylor* Court found it irrelevant to the issue. Rather, it reasoned that existence of a warrant filed *ex parte* may not be considered an "intervening event." when an accused is unaware that one has been obtained.[3]

Here, unlike *Taylor* but as in *Johnson v. Louisiana,* appellant was taken before a magistrate who advised him of his rights and signed arrest warrants. Thus warrants were not issued *ex parte* and appellant was well aware that booking and photographing that followed were done on account of his being detained by reason of actions of a magistrate rather than initial arrest by police officers. Known to appellant, those developments certainly qualify as "intervening events," relevant to whether his subsequent confession was a fruit of the original illegal arrest.

For those reasons I would overrule ground of error six. Accordingly, I join the judgment of the Court.

McCORMICK, Judge, concurring.

Perceiving that exigent circumstances did exist, and thus appellant's arrest was proper under Article 14.04, V.A.C.C.P., I disagree with the need for the majority to enter into any type of discussion regarding the admission into evidence of appellant's confessions and any attenuating circumstances. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

However, because I agree with the result ultimately reached by the majority, I concur with the judgment of the Court.

---

2. The majority believes "this situation differs critically from *Taylor,*" but what Justice Marshall was saying about the arrest warrant there underscores the meaning of *Wong Sun* and *Brown v. Illinois* for us here, *viz:*

> "The filing of this warrant, however, is irrelevant to whether the confession was the fruit of the illegal arrest. This case is *not* like *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), *where the defendant was brought before a committing Magistrate who advised him of his rights and set bail.* Here, the arrest warrant was filed *ex parte* ..." [my emphasis].

3. In the balance of his explication Justice Marshall turned the focus away from warrant to fingerprints, *viz:*

> "The initial fingerprints, which were themselves the fruit of petitioner's illegal arrest ... and which were used to extract the confession from petitioner, cannot be deemed sufficient 'attenuation' to break the connection between the illegal arrest merely because they also formed the basis for an arrest warrant that was filed while petitioner was being interrogated."