In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-01-340 CR


____________________



DAVID LEE YEAGER, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the Criminal District Court


Jefferson County, Texas


Trial Court Cause No. 82480






O P I N I O N


 Appellant David Lee Yeager was indicted for the offense of murder. A jury
convicted him of the lesser-included offense of manslaughter, and the trial court assessed
his punishment at twenty years in the Texas Department of Criminal Justice -- Institutional
Division. Yeager appeals, challenging the sufficiency of the evidence and the
voluntariness of his confession. 



Background Facts


 David Yeager was seen taking a radio belonging to Johnny Lozano's son. Johnny
went to retrieve the radio from Yeager, who lived a short distance from the Lozano house. 
 Sixteen-year-old Teri Hardi was with Yeager and some other friends that day. They
were all drunk. She testified she saw Yeager hit Johnny Lozano approximately thirteen
or fourteen times in the face and head with his fists. Teri observed Yeager repeatedly kick
Lozano hard. At one point, Yeager began stomping with both his feet on Lozano. Teri
described the stomping as "jumping up and down on [Lozano] with all of his weight." 
After Yeager stopped, he angrily yelled, "I'm going to get him out of my yard" and then
he dragged Lozano out of the yard to the middle of the road and kicked him again. On
cross examination, Teri acknowledged that she left some things out when she first talked
to the police. Her initial statement to the authorities contained no reference to kicking or
stomping, and described Johnny as appearing mad. 

 Arthur Collins, twenty-six years old, testified that he, Yeager, Teri, and Christy
Conwell were "just hanging out drinking." His testimony corresponded with much of Teri
Hardi's account. According to Collins, Yeager came out of the house, ran up to Johnny,
and angrily said, "I'm going to kill you . . . ." Yeager then hit Johnny in the face with
his fists and continued to hit him. Arthur explained he went inside the house and, unlike
Teri, never saw Yeager stomp on Johnny. Arthur also testified he pulled Yeager back at
one point, but then Yeager "ran up again and he started hitting [Johnny] again and then I
pulled him back twice and that's when he [quit]." 

 Testifying in his own defense, David Yeager declared that although he was with
Arthur when the radio was taken from the Lozanos, it was actually Arthur who took it. 
Yeager returned to his house and lay down. Hearing a car horn honk, he looked outside
and saw Johnny Lozano leaning over the car window. Johnny was yelling and screaming,
and Yeager told him three times to leave the yard. Lozano swung at Yeager, and the fight
began. Yeager maintains Johnny hit him a few times, and Yeager hit Johnny only two
times. Yeager submitted photographs taken of himself that showed bruises and scrapes
allegedly sustained during the "fight."

 Detective Harrison indicated that the statements he initially took from Teri and
Arthur made no mention of any "kicking" or "stomping." The first time he heard those
words in connection with Lozano's death was at the autopsy performed the morning after
Lozano died. Officer Legnon testified that Teri Hardi told him the night Lozano died that
Yeager kicked and beat up Lozano, but those words are not in the police report. 

 Dr. Brown, the forensic pathologist who performed the autopsy, testified "[t]he
cause of death was a ruptured heart . . . due to blunt force injury"; he reported the death
as a homicide. Brown agreed someone outside the profession would probably not know
that this type of blunt trauma could cause a heart rupture or death. In addition to the
ruptured heart, Lozano had fractures of both sides of his cheekbones, severe fractures of
the nasal bones, a large bruise of the collar bone, a large abrasion in the buttock area,
hemorrhage at the back of his head on both sides, and fractures of five ribs on one side and
four ribs on the other side. Dr. Brown concluded that the heart rupture was consistent
with someone stomping Lozano and that "[Lozano] died because he was beaten to death." 

 Issue One -- Sufficiency of the Evidence


 Yeager contends the evidence is legally and factually insufficient to convict him of
manslaughter. In a legal sufficiency review, this court looks at all of the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt. Jackson v.
Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In a factual sufficiency
review, we consider all the evidence without the prism of "in the light most favorable to
the prosecution" and set aside the verdict only if it is so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust. Santellan v. State, 939 S.W.2d
155, 164 (Tex. Crim. App. 1997).

 A person commits the offense of manslaughter if he recklessly causes the death of
an individual. See Tex. Pen. Code Ann. § 19.04 (Vernon 1994). Yeager contends the
evidence is insufficient to show he was reckless -- i.e., that he was aware the risk of death
was present. The trier of fact makes its determination of culpable mental state from all of
the circumstances and may make reasonable inferences from the acts, words, and conduct
of the accused. See Arellano v. State, 54 S.W.2d 391, 393-94 (Tex. App.--Waco 2001,
pet. ref'd). Here the jury was free to disbelieve Yeager when he said he only hit Lozano
twice; the jury could have believed Arthur Collins when he testified Yeager repeatedly hit
Lozano, and believed Teri Hardi when she testified Yeager kicked and stomped Lozano
repeatedly. "'At the heart of reckless conduct is conscious disregard of the risk created
by the actor's conduct.'" Trepanier v. State, 940 S.W.2d 827, 829 (Tex. App.--Austin
1997, pet. ref'd)(quoting Lewis v. State, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975)). 
From the basic fact of kicking and stomping on the stomach of a person lying prone on the
ground, the jury could have inferred the ultimate fact of appellant's recklessness -- i.e.,
that he consciously disregarded the risk of his conduct. The evidence is legally and
factually sufficient to support the finding that Yeager was reckless.

Voluntariness of the Confession


 In issues two and three, Yeager contends the trial court erred in denying his pre-trial
motion to suppress and in later admitting his written statement into evidence at trial. He
maintains the statement was involuntary because it contains inaccuracies. Specifically,
Yeager asserts he never told the officer who typed the statement that he side-kicked Johnny
Lozano. 

 An accused's statement may be used against him if it appears that it was freely and
voluntarily made without compulsion or persuasion. See Tex. Code Crim. Proc. Ann.
arts. 38.21, 38.22 (Vernon 1979 & Supp. 2002); Wyatt v. State, 23 S.W.3d 18, 23 (Tex.
Crim. App. 2000). The determination of the voluntariness of a confession depends upon
an examination of the totality of circumstances surrounding its acquisition. Id. (citing
Penry v. State, 903 S.W.2d 715, 744 (Tex. Crim. App. 1995)). 

 At the suppression hearing, Detective Harrison testified that, prior to taking the
statement, he orally advised Yeager of his constitutional rights, and Yeager told Harrison
that he understood those rights. In explaining the process of taking the statement, Harrison
testified that as "[Yeager] talked, I typed a statement out." "[W]e talk and I type a little
bit and . . . try to get it the best I can to the way they want their statement to read." 
Yeager described the process in similar fashion: "He would ask me a question and then he
would type it and then he would ask me a question and type it." Harrison acknowledged
he did not type the statement word-for-word and agreed it was fair to call it a
"condensation" or paraphrase of what was said. He indicated he could not say that the
word "sidekick" was Yeager's exact wording, but he thought that Yeager told him about
the "kick." 

 Once the statement was completed, Harrison then gave Yeager a written version of
it with the warnings printed at the top of the page. Harrison asked him to "re-read the
warnings" and "initial them as he went down the page to make sure that he understood
them." The record reflects that each warning is initialed. Harrison also asked him to
initial the waiver, read the statement, and then sign it. According to Harrison, Yeager
never asked for an attorney during the interview and never requested that Harrison stop
asking him questions or stop the interview. 

 During Yeager's testimony, at the suppression hearing, he indicated he was "not
sure" and did not remember whether Detective Harrison gave him the warnings. He said
he did not remember whether he had a chance to read the statement prior to signing it; he
supposed he did, but he was not sure. Yeager stated, "[T]hat is my signature" and "I
know that it's mine." When asked whether he mentioned the word "kick" first, Yeager
responded as follows:

 Q. (Defense Counsel): . . . [D]o you recall . . . whether you mentioned the
word, "kick" first or whether Detective Harrison did? 

 A. (Yeager): He asked me . . . if I hit [Lozano] and then he asked me if I
kicked him.

 Q. And what was your response?

 A. I told him, "No". I told him, "I hit him." And then I told him that, "I
didn't kick him".

 Q. What was his response?

 A. . . . I remember him asking me if I kicked him. I said . . . "I didn't
think so." And then he asked me, if I would have, how I would have did it. 
And I said, "I don't know." . . . . He asked me, "Would it have been with
a side kick"? And I said, "I don't know. If I kicked him -," I said "- it
might have been", you know. He asked me to name some specific kind of
kick. And, I mean, I couldn't really just do that for him.

 . . . .

 Q. And . . . then he mentioned, if you did kick him, would it have been
with a side kick?

 A. Yes, sir.

 Q. And, you said what -

 A. I told him, "I didn't know", you know. "If I was to kick somebody, I
guess that might be how I would have did it".

 Q. Okay. Now, I want to ask you this: did you say that - "Then I kicked
him with a side kick in the chest." Is that - any part of your testimony to - -

 A. Those weren't my words; no, sir. 

 . . . .

 Q. . . . This does not reflect your voluntary statement?

 A. No, sir. 


On cross examination Yeager acknowledged he signed the statement at the bottom of both
pages one and two, and that he initialed the warnings. Yeager indicated he knew that he
had a right to remain silent, that any statements he did make could be used against him at
trial, that he could stop the interview at any time, that he had a right to have an attorney
present to advise him, and that if he could not employ an attorney, the judge would appoint
one. He also indicated the procedure was not new to him as he had been arrested before
and had been read his constitutional rights before. On redirect examination by his trial
counsel, Yeager indicated he was not given the warnings and did not know what his rights
were. However, he does not make that argument on appeal. Appellant's argument on
appeal concerning involuntariness of the statement is based solely on the allegation of
inaccuracy in the statement. 


 The trial judge heard conflicting, and at times confusing, testimony. He heard
Yeager's testimony about the "kicking" and "sidekick" language. He heard Detective
Harrison testify he paraphrased what Yeager told him during the custodial interrogation. 
"The law does not require that a confession be in the exact language of the accused." Bell
v. State, 724 S.W.2d 780, 793 (Tex. Crim. App. 1986). So long as the confession is
voluntary, an officer may reduce a defendant's oral statement into writing; the officer is
allowed to paraphrase the statement. Heiselbetz v. State, 906 S.W.2d 500, 512 (Tex.
Crim. App. 1995). The mere act of paraphrasing does not render the statement
involuntary. 

 In effect, appellant argues that a portion of the written confession was not his
statement, despite his signature on the confession. The resolution of this issue turned on
the credibility of the witnesses. Based on the totality of circumstances and on the proper
deference to the trial court's ruling, we hold the trial court did not abuse its discretion in
denying appellant's motion to suppress. See Guzman v. State, 955 S.W.2d 85, 89 (Tex.
Crim. App. 1997).

 At trial Yeager again challenged the admissibility of the statement. Harrison
repeated his testimony that he read each of the warnings to Yeager and that Yeager
indicated he wanted to waive those rights and to talk to Harrison. Harrison again
explained the process of typing while Yeager talked to him. During defense counsel's voir
dire of Harrison, Harrison indicated the witness Teri Hardi did not mention to him
anything about Yeager's kicking the victim, and that he (Harrison) first heard of the idea
that "feet must have been used" during Dr. Brown's autopsy on Lozano. In response to
trial counsel's questions about situations where a statement does not reflect what the
defendant actually said, Harrison explained the safeguards surrounding the process he uses
in taking a statement:

 That's why the process is done where I type the statement and then the
statement is handed to the person that made the statement and they have an
opportunity to correct something or change something that they don't like
because it's their statement. And if there's some word in there, then, that
is their opportunity to tell me they don't like something and I can change it
on the word processor. 

 At trial, the considerations surrounding the admissibility of the statement into
evidence were much the same as those presented at the suppression hearing. A trial
judge's decision to admit or exclude evidence is reviewed under an abuse of discretion
standard. See Salazar v. State, 38 S.W.3d 141, 153-54 (Tex. Crim. App. 2001). Under
the circumstances, it was for the trier of fact to decide whether the written confession
signed by appellant accurately described his actions. We conclude the trial judge did not
abuse his discretion in admitting the statement into evidence. Issues two and three are
overruled.

 The conviction is affirmed.

 AFFIRMED.


 PER CURIAM 
 

Submitted on August 22, 2002

Opinion Delivered August 28, 2002

Do Not Publish 


Before Walker, C.J., Burgess, and Gaultney, JJ.