

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

AP-75,633

HOWARD PAUL GUIDRY, Appellant

v.

THE STATE OF TEXAS

On Direct Appeal from Case No. 1073163 of the
230th Judicial District Court,
Harris County

*WOMACK, J., delivered the opinion of the Court, in which KELLER, P.J., and JOHNSON, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined. MEYERS and PRICE, JJ., concurred in the judgment.*

The appellant challenges his conviction for capital murder[1] for his part in the 1994

shooting of Farah Fratta. Pursuant to the jury's answers to the special punishment issues, the trial

---

[1] See PENAL CODE § 19.03(a)(2) & (3).

judge sentenced the appellant to death.[2] The appellant raises fourteen points of error on this

direct appeal. Finding no error, we shall affirm the trial court's judgment.

PROCEDURAL BACKGROUND

On March 21, 1997, the appellant was found guilty of the capital murder of Farah Fratta,

and he was sentenced to death on March 26. In 1999, this court affirmed his conviction on direct

appeal.[3] In 2000, this court denied the appellant's application for habeas corpus. In 2003, the

United States District Court for the Southern District of Texas granted relief on a petition for writ

of habeas corpus, ordering a new trial.[4] The Court of Appeals for the Fifth Circuit affirmed on

January 14, 2005.[5] In the appellant's second trial for capital murder, he was found guilty on

February 22, 2007, and was sentenced to death on March 1 of that year. This is his direct appeal

from that conviction.

TESTIMONY OF DR. BASINGER

In points of error one through three, the appellant contends that the trial court erred in

admitting the testimony of Dr. Scott Basinger, in violation of his rights under the Fifth

Amendment and under Article 38.23 of the Code of Criminal Procedure.[6] Dr. Basinger was hired

by the appellant as a mitigation expert for the punishment phase of his first trial. During the

---

[2] See CODE CRIM. PROC. art. 37.071, § 2(b), (c), & (g).

[3] *Guidry v. State,* 9 S.W.3d 133 (Tex. Cr. App. 1999).

[4] *Guidry v. Dretke*, 2003 U.S. Dist. LEXIS 26199 (S.D. Tex. 2003). The appellant was granted relief based on the admission of what the district court found to be two illegally obtained confessions to police officers.

[5] *Guidry v. Dretke,* 397 F.3d 306 (5th Cir. 2005).

[6] This statute provides, in part, "No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case."

course of an interview with the appellant in preparation for that trial, the appellant admitted to Dr. Basinger that he had committed the murder. On cross-examination at the trial, the prosecutor asked Dr. Basinger whether the appellant had admitted to the shooting. Over defense objection, Dr. Basinger responded in the affirmative. In the second trial, Dr. Basinger was called as a fact witness by the prosecution and was asked about his testimony at the previous capital trial. Over objection, Dr. Basinger again testified that the appellant had admitted to the murder. The appellant now argues that his statements to Dr. Basinger were compelled by the illegal admission of his confessions to police, and that the admission to Dr. Basinger was the "fruit of the poisonous tree" of the confessions to police. He also argued that the admission to Dr. Basinger was obtained in violation of Article 38.23, and that, but for the illegally obtained confessions to police, the appellant would not have made an incriminating statement to Dr. Basinger.

The Fifth Amendment to the Constitution of the United States prevents the prosecution from using "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[7]

In this case, Dr. Basinger was not working on behalf of the police when the appellant's admission was made to him. Rather, he was working on behalf of the appellant himself as an

---

[7] *Miranda v. Arizona,* 384 U.S. 436, 444 (1966).

expert witness.[8] In short, the appellant was never "exposed to the 'the cruel trilemma of self-accusation, perjury or contempt.'"[9] Thus, the Fifth Amendment is not directly implicated.

The appellant further argues that his admission to Dr. Basinger is the "fruit of the poisonous tree," where the primary violation was the evidence of illegally procured confessions to police admitted at the appellant's first capital trial. The appellant contends that but for the illegally obtained confessions, Dr. Basinger never would have testified at trial, because no trial ever would have taken place. Relying heavily on *Harrison v. United States,*[10] the appellant claims that Dr. Basinger's testimony was compelled by the admission of the illegally obtained confessions to the police, and was therefore inadmissible.

The case at bar is distinguishable from *Harrison* for two reasons. First, the decision to put Harrison on the stand was made only after the illegally obtained confessions were admitted into evidence, as were his inculpatory statements. Here, the inculpatory admission to Dr. Basinger was made before the first trial, and there is no evidence that it was in response to the admission of the illegally obtained confessions. Second, in *Harrison* the defendant himself chose to testify at trial, unlike here, where the testimony originated from a witness other than the defendant. *Harrison* specified that it was limited to the testimony of a defendant who is compelled to testify

---

[8] *See Wilkerson v. State*, 173 S.W.3d 521 (Tex. Cr. App. 2005). In *Wilkerson*, the defendant made inculpatory statements to a Child Protective Services caseworker which were admissible, even though the defendant was in custody at the time, because the caseworker was not working on behalf of the police.

[9] *Michigan v. Tucker*, 417 U.S. 433, 445 (1974), quoting *Murphy v. Waterfront Commission*, 378 U.S. 52, 55 (1964).

[10] 392 U.S. 219 (1968). In *Harrison*, the defendant testified at his own trial after his previous confessions were entered into evidence. The confessions were subsequently deemed to have been obtained illegally, and the defendant was granted a new trial. At the second trial, the defendant's former testimony was introduced into evidence. The defendant contended that his former testimony was inadmissible at the second trial because he had been compelled to testify due to the introduction of the tainted confessions. The Court held that the former testimony was inadmissible because the defendant testified only to overcome the impact of the illegally obtained confessions, after the confessions were admitted. The Court reversed his second conviction.

on his own behalf because of the introduction of an illegally obtained confession. In that case, the Court expressly declined to extend its holding to include the testimony of a third-party witness. [11] Accordingly this court declines to do so.

Furthermore, although the admission to Dr. Basinger may not have come to light but for the illegal actions of police, "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence. Our cases show that 'but-for' causality is only a necessary, not a sufficient, condition for suppression."[12] "Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come by at the exploitation of that illegality or instead by means sufficiently distinguishable as to be purged of the primary taint.'"[13] Attenuation can occur when the causal connection is remote. [14]

In *Bell v. State* this court announced factors in determining attenuation, which included the furnishing of *Miranda* warnings, the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct.[15] In applying those factors to this case, we look to the passage of time, the appellant's appointment of counsel, the hiring of an expert witness, and other preparation for trial. Together, they provide a sufficient break in the chain of causation stemming from the

[11] *Harrison,* 392 U.S., at 224 n.2.

[12] *Hudson v. United States,* 547 U.S. 586, 592 (2006).

[13] *Wong Sun v. United States,* 371 U.S. 471, 487-88 (1963) (quoting MAGUIRE, EVIDENCE OF GUILT 221 (1959)).

[14] *See Nardone v. United States*, 308 U.S. 338, 341 (1939).

[15] 724 S.W.2d 780 (Tex. Cr. App. 1986).

primary illegality. We conclude that Dr. Basinger's testimony was admissible.  Points one, two, and three are overruled.

JURY UNANIMITY

In points of error four through seven, the appellant argues that the court's charge to the jury denied his right to a unanimous verdict, thus violating several constitutional provisions. In order to preserve a complaint for appellate review, a party generally must have presented a timely request, objection, or motion that states the specific grounds for the desired ruling, if they are not apparent from the context of the request, objection or motion.[16] A statute specifically requires that a defendant object to the charge of the court.[17] In the case before us, there was no objection to the charge at trial, and thus the issue was not preserved under that statute.

According to this court's construction of another statute, when error in the charge was not called to the trial court's attention, a judgment of conviction will be reversed only on a showing that the defendant was denied a fair trial.[18] The eighth point of error argues that there was a denial of a fair trial because the charge allowed the jury to convict without agreeing unanimously whether the defendant committed murder for remuneration or murder in the course of committing burglary.[19] This charge did not deny the appellant a fair trial. Indeed, it was not erroneous.[20]

---

[16] R. APP. P. 33.1(a).

[17] *See* CODE CRIM. PROC. art. 36.14.

[18] *Almanza v. State*, 686 S.W.2d 157 (Tex. Cr. App. 1984) (construing CODE CRIM. PROC. art. 36.19).

[19] Under Section 19.03(a)(2) of the Penal Code, a person commits capital murder if he intentionally causes the death of an individual in the course of committing or attempting commit any of several offenses, including burglary. Under Section 19.03(a)(3), a person commits capital murder if he intentionally or knowingly causes the death of an individual for remuneration or the promise of remuneration.

[20] *Kitchens v. State*, 823 S.W.2d 256 (Tex. Cr. App. 1991), *cert. denied*, 504 U.S. 958 (1992) (not fundamental error to submit, in one paragraph of the charge, alternative theories of capital murder committed in the course of committing robbery or sexual assault).

"When an indictment alleges different methods of committing capital murder in the conjunctive, the jury may properly be charged in the disjunctive. … The unanimity requirement is not violated by instructing the jury on alternative theories of committing the same offense …."[21]

Points four through eight are overruled.

## EFFECTIVE ASSISTANCE OF COUNSEL

In his ninth and tenth points of error, the appellant complains that he was denied his right to effective assistance of counsel under the Sixth Amendment to the Constitution of the United States because his attorney neither objected to, nor requested a hearing on the admissibility of, the testimony of Mary Gipp-McNeill.

As this court has previously noted,[22] since the record does not usually reflect the reasoning or motivation behind counsel's actions or inactions, it is rarely possible to assess such a claim fairly on direct appeal. Because of this, the appellant will rarely be able to meet the first prong of the *Strickland* test, which is to show that counsel's performance fell below an objective standard of reasonableness.[23] Absent a motion for new trial and an examination of counsel's strategy, the record is not sufficiently developed, and the issue is more appropriately addressed in an application for writ of habeas corpus where defense counsel will have the opportunity to explain his acts or omissions. Points nine and ten are overruled.

---

[21] *Martinez v. State*, 129 S.W.3d 101 (Tex. Cr. App. 2004) (overruling claim that it was error for the trial court to permit the prosecutor to argue that the jury need not unanimously agree whether the murder was committed in the course of robbery or sexual assault).

[22] See *Mata v. State,* 226 S.W.3d 425, 430 (Tex. Cr. App. 2007); *Roberts v. State,* 220 S.W.3d 521, 533 (Tex. Cr. App. 2007).

[23] *See Strickland v. Washington*, 466 U.S. 688 (1984).

*BATSON* CHALLENGE

In his eleventh point of error, the appellant contends, under authority of *Batson v. Kentucky*,[24] that the trial court erred in overruling his objection to the State's exercise of a peremptory challenge in violation of the Equal Protection Clause of the Fourteenth Amendment.

A defendant objecting under *Batson* must make a *prima facie* showing of racial discrimination in the State's exercise of its peremptory challenges.[25] The burden then shifts to the State to provide race-neutral explanations for its peremptory strikes.[26] If the State articulates race-neutral explanations, the burden shifts back to the defense to show that the State's reasons are pretexts for discrimination.[27] The trial court must rule as to whether the defense has carried its burden of proving purposeful discrimination.[28] This determination is accorded great deference and will not be overturned on appeal unless the ruling is clearly erroneous.[29]

Here, the defense objected under *Batson* to the State's use of a peremptory challenge against Venireman Matthew Washington. The court inquired into the prosecution's reasons for the peremptory challenge. The prosecution explained:

> To start with, he's a member of [name omitted] Church. And we have a running agreement, my partner Luci Davidson and I have, since we started, that people who go to [that church] are screwballs and nuts. I'm very familiar with that church. That's one reason that scared me about the man.

---

[24] 476 U.S. 79, 81 (1986).

[25] *Herron v. State,* 86 S.W.3d 621, 630 (Tex. Cr. App. 2002); *Mathis v State,* 67 S.W.3d 918, 924 (Tex. Cr. App. 2002).

[26] *Herron,* 86 S.W.3d, at 630.

[27] *Ibid.*

[28] *Ibid.*

[29] *Ibid.*

The next reason is when asked why people commit violent crimes, his answer before we started talking to him today is "no education, no opportunities." In my mind, people who have no education, no opportunities might be bums, might be slackers, might be lazy, but that doesn't justify committing a violent crime.

In addition to that, he talks about the fact that he's been discriminated against at work, and he says on those occasions, two to three of them, when he was discriminated against, 85 percent of the group that was discriminating against him was white. The other 15 percent was "other" and when pressed, he said they were Asian. That's happened on more than one occasion and the people that passed him over were white. Right after that he went right on and sort of went on to say, in everyday life, we're all treated as second-class citizens. And there's two black men on this jury that are wonderful men that didn't seem to have any issues at all about anything like that about being black men in America today. This man is different. He was very hesitant in answering my questions. He didn't seem like he was comfortable answering any of the questions. I didn't get a good feeling talking to him, unlike every other juror who I put on this jury, I didn't feel that way talking to Mr. Washington.

And then, to sum it all up, he might know Jeff Strange, who's a prosecutor in Fort Bend County. In the corner – in the context of this courtroom, I can say I know Jeff Strange very, very well and knowing Jeff Strange, just because he's a prosecutor, doesn't mean anything. That doesn't mean anything in my opinion.

Finally, he says he's an active member of the NAACP to the degree that he goes all the way back home to Snook, Caldwell, Burleson County, Texas, to attend the meetings that his mom and dad never miss. The NAACP's stated objective – one of them is to get rid of the death penalty, to be opposed to the death penalty, to talk to people about how to get rid of the death penalty and they are very, very much for the Legal Defense Fund, which its main objective is to oppose the death penalty.

The last thing, Judge, is one of the number one advocates and supporters of the NAACP in Harris County is Quanell X. I am quite sure Mr. Washington knows who Quanell X is and Quanell X could very well be a defense witness in this trial, because Quanell X is one of the people that Howard Guidry wanted to talk to when he took a hostage on death row. So Quanell X is going to be coming up to this trial and I don't want a man who's supportive of the NAACP as Mr. Washington is to be anywhere near this jury. And those are my race-neutral, very race-neutral reasons for why I exercised a peremptory.

The trial court found that the State exercised its challenge fairly and for race-neutral reasons. The defense did not attempt to demonstrate that the State's reasons were pretextual, and explicitly stated that it neither objected to nor desired to change the court's decision.

As the Supreme Court stated in *Miller-El v. Cockrell*:[30]

---

[30] 537 U.S. 322, 340 (2003).

"[T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy . . . In the context of direct review, therefore, we have noted that "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" and will not be overturned unless clearly erroneous . . . ."[31]

Since the record does not indicate that the trial court's ruling was clearly erroneous, point of error eleven is overruled.

VICTIM-IMPACT EVIDENCE

In points of error twelve through fourteen, the appellant claims that the trial court erred in overruling his objection to the admission of testimony about the effect of extraneous offenses. Since the only objection at trial was to relevance, it is the only ground preserved for appeal. We shall not address the appellant's Eighth and Fourteenth Amendment arguments which are made for the first time on appeal.

Paulette Scott, Chantal Peve, Gene Hovermale, and Jeanette Bledsoe were called as witnesses for the prosecution at the punishment phase of the trial. Each of them testified as to the effect an extraneous offense, committed by the appellant, had on them. (The appellant robbed the first three witnesses at a bank. The fourth witness was a prison guard whom the appellant took hostage.) The trial court overruled the appellant's objections.

Article 37.071, Section 2(a)(1) of the Code of Criminal Procedure provides that "evidence may be presented by the state and the defendant or the defendant's counsel as to any matter that the court deems relevant to sentence …."

---

[31] *Miller-El*, 537 U.S., at 339, citing *Wainwright* v. *Witt,* 469 U.S. 412, 428 (1985); *see also Watkins v. State,* 245 S.W.3d 444, 457 (Tex. Cr. App. 2008).

As this court stated in *Roberts v. State*,[32] "'Victim impact' evidence is evidence of the effect of an offense on people *other* than the victim."[33] The "offense" in question is the one that is at issue in the guilt stage of the trial. In this case, the testimony was about the effect of extraneous crimes on the victims of those crimes.[34] The testimony at issue in this case is not victim-impact evidence, and referring to it as such only serves to confuse the issue. The testimony offered here was admissible under Article 37.071 and was relevant to the future-dangerousness issue.[35] Points of error twelve, thirteen, and fourteen are overruled.

The trial court's judgment is affirmed.

Delivered October 21, 2009.
Do not publish.

---

[32] 220 S.W.3d 521 (Tex. Cr. App. 2007).

[33] *Id.,* at 531, citing *Garcia v. State*, 126 S.W.3d 921, 929 (Tex. Cr. App. 2004). *See also Guevara v. State*, 97 S.W.3d 579, 583 (Tex. Cr. App 2003); *Mathis v. State*, 67 S.W.3d 918, 928 (Tex. Cr. App 2002).

[34] As this court recently explained in *Hayden v. State,* __ S.W.3d __, __, 2009 WL 928569, *3, 2009 Tex. Crim. App. LEXIS 510, *8-9) (Tex. Cr. App., PD-0860-07, April 8, 2009), "[i]n the past, we have occasionally referred to 'victim impact evidence' as a broad category that includes both victim character evidence and victim impact evidence. (*E.g. Salazar,* 90 S.W.3d at 355.) Regrettably, this imprecision has become entrenched in this state's jurisprudence. Victim 'impact' evidence is evidence of the effect of the victim's death on other people."

[35] CODE CRIM. PROC. art. 37.071, § 2(b)(1) ("whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society …").